# Exhibit A

Electronically FILED by Superior Court of California, County of Los Angeles on 11/15/2021 05:41 PM Sherri R. Carter, Executive Officer/Clerk of Court, by D. Williams, Deputy Clerk
21STCV42124
Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Michael Whitaker

Alan Romero (SBN 249000)
Ted Wells (SBN 321696)
Angela Xie (SBN 333530)
Lucas E. Rowe (SBN 298697)
ROMERO LAW, APC
80 S. Lake Avenue, Suite 880
Pasadena, CA 91101-2672
Tel: 626.396.9900 / Fax: 626.396.9990
Email: firm@romerolaw.com

Attorneys for Plaintiff
JOSHUA SANCHEZ

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES – CENTRAL DISTRICT

| | |
|---|---|
| JOSHUA SANCHEZ, an individual;<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, a political subdivision of the State of California; Custody Assistant Y. CHENG, a public employee; Custody Assistant J. ZAVALA, a public employee; and Custody Assistant O. ESTRADA, a public employee; and DOES 1-99, inclusive;<br><br>Defendants. | Case No.: 21STCV42124<br><br>**UNLIMITED COMPLAINT FOR DAMAGES**<br><br>1) UNLAWFUL SEIZURE / 42 U.S.C. § 1983 (4TH AMENDMENT)<br>2) EXCESSIVE FORCE / 42 U.S.C. § 1983 (14TH AMENDMENT)<br>3) PUBLIC ENTITY LIABILITY / 42 U.S.C. § 1983 (4TH AMENDMENT)<br>4) PUBLIC ENTITY LIABILITY / 42 U.S.C. § 1983 (14TH AMENDMENT)<br>5) PUBLIC ENTITY LIABILITY / 42 U.S.C. § 1983 (1ST AMENDMENT RETALIATION)<br><br>**[JURY FEE DEPOSIT POSTED]** |

**COMES NOW THE** Plaintiff JOSHUA SANCHEZ, ("Plaintiff"), who heretofore alleges the following facts in support of their Unlimited Complaint for Damages and hereby respectfully demands *a speedy jury trial* on all causes of action stated herein as against the COUNTY OF LOS ANGELES, a political subdivision of the State of California, Custody Assistant Y. CHENG, Custody Assistant J. ZAVALA, and Custody Assistant O. ESTRADA, who along with DOES 1-99, inclusive, are referred to herein as the "Defendants".

## CASE SYNOPSIS

1. Plaintiff Joshua Sanchez is a Custody Assistant at the County of Los Angeles. He always wanted to become a police officer. However, because of the acts and omissions of the County of Los Angeles, Y. Cheng, J. Zavala, and O. Estrada, Sanchez has suffered a severe knee injury that has effectively ended his career before it began, days before Sanchez was set to begin training at the Los Angeles County Sheriff's Academy.

2. Pursuant to longstanding County custom, Y. Cheng, J. Zavala, and O. Estrada hazed Plaintiff days before he was set to enter the Academy. This custom is well known throughout the Sheriff's Department and no steps are taken to curb it. Custody Assistants are not trained with respect to hazing, even though the County knows of this longstanding practice. On the contrary, the County approves of or is deliberately indifferent to the practice of hazing custody assistants before their entrance into the Academy.

3. As part of the hazing ritual, the individual defendants purposely held Plaintiff down in an office chair and tased him in the knee, causing great injury. They intended to harm Plaintiff.

4. As a result of the injury inflicted on him, Sanchez has had multiple surgeries, injections, and other medical procedures. However, his recovery has been limited and it appears that he will be forced into medical retirement before he could begin his career as a police officer, because of the wrongful acts and omissions of the County of Los Angeles and the individual defendants.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### Jurisdiction and Venue

5. This Court has jurisdiction of the subject matter of Plaintiff's claims. Jurisdiction is proper in this Court because the damages and claims alleged and demanded herein by Plaintiff exceeds $25,000, and Plaintiff herein does make a demand and prayer for damages, in excess, of the jurisdictional limit of this Court.

6. This Court has personal jurisdiction over Defendant County of Los Angeles in that it was, at all relevant periods of time covered by this complaint, a county maintaining a place of business where it employed Plaintiff, at 450 Bauchet Street, Los Angeles, CA 90012.

7. This Court has personal jurisdiction over the individual defendants in that they all,

1  on information and belief, reside in the County of Los Angeles, and that the operative nucleus of
2  fact with respect to this litigation occurred in the County of Los Angeles.

3      8. Venue in this Court is proper in that, upon information and belief, all Defendants
4  reside in the County of Los Angeles.

5      9. All the harm suffered by Plaintiff took place within this judicial district.

6      10. Plaintiff was an employee of Defendants, jointly and severally.

### Relationship Between the Defendants

8      11. Plaintiff is informed and believes, and thereupon alleges, that Defendants, and each
9  of them, were at all times mentioned herein the agents, servants, and employees of each other, or
10 otherwise were acting with the full knowledge and consent of each other. Plaintiff is further
11 informed and believes, and upon such basis and belief alleges, that in doing all of the things alleged
12 in this complaint, Defendants, and each of them, were acting within the scope and authority of their
13 agency, servitude, or employment, and were acting with the express and/or implied knowledge,
14 permission and consent of one another. Plaintiff is further informed and believes, and upon such
15 basis and belief alleges, that Defendants learned of, ratified, and/or approved the wrongful conduct
16 of its agents and/or employees identified in this Complaint as having engaged in wrongful conduct.

17     12. Plaintiff is informed and believes, and thereupon alleges, that at all relevant times,
18 Defendants, and each of them, were business entities or individuals who owned, controlled, or
19 managed the business which has damaged Plaintiff, and are each therefore jointly, severally, and
20 individually liable to Plaintiff.

21     13. Plaintiff is informed and believes, and thereupon alleges, that at all relevant times,
22 Defendants, and each of them, were in some fashion, by contract or otherwise, the successor,
23 assignor, indemnitor, guarantor, or third-party beneficiary of one or more of the remaining
24 Defendants, and at all relevant times to Plaintiff's claims alleged herein, were acting within that
25 capacity. Plaintiff further alleges that Defendants, and each of them, assumed the liabilities of the
26 other Defendants, by virtue of the fact that each to some degree, wrongfully received and/or
27 wrongfully benefited from the flow of assets from the other Defendants, to the detriment of Plaintiff.
28 Plaintiff further alleges that by wrongfully receiving and/or benefiting from Defendants' assets, and

1. in the consummation of such transactions, a *de facto* merger of the Defendants, and each of them, resulted, such that Defendants, and each of them, may be treated as one for purposes of this Complaint.

14. Plaintiff is informed and believes, and thereupon alleges, that at all relevant times mentioned herein, Defendants, and each of them, were the partners, agents, servants, employees, joint venturors, or co-conspirators of each other defendant, and that each defendant was acting within the course, scope, and authority of such partnership, agency, employment, joint venture, or conspiracy, and that each defendant, directly or indirectly, authorized, ratified, and approved the acts of the remaining Defendants, and each of them.

15. At all times relevant to this action, the individual defendants acted under color of California law.

### No Claims Arising from Privileged Conduct

16. In the avoidance of doubt, Plaintiff does not herein allege any claim for damages as against Defendants for any privileged action, such as the conducting of an investigation by a public entity. Plaintiff, however, reserves the right to claim all damages arising out of *consequences or actions* resulting from, or occasioned by, such a privileged investigation by a public entity.

17. Plaintiff expressly excludes from this Complaint any privileged act by any Defendant to this action that would otherwise result in a Special Motion to Strike pursuant to Code Civ. Proc. § 425.16.

### No Punitive Damages against the County of Los Angeles

18. Plaintiff expressly disclaims any punitive damages against the County of Los Angeles. Plaintiff does not seek punitive damages against the County of Los Angeles.

### Factual Allegations

19. Plaintiff Joshua Sanchez always wanted to become a police officer. Thus, at the age of 18, too young to become a Deputy Sheriff, he became a Custody Assistant at the Twin Towers jail, in order to obtain experience useful in becoming a Los Angeles County Sheriff's Deputy. Sanchez was hired by the County on <u>March 28, 2018</u> as a Custody Assistant. Custody Assistants are not sworn California peace officers, but they are agents of the County at the Twin Towers jail. They

work directly with inmates and detainees at the jail, and as such, wield the power of the state. They wear uniforms and are addressed by the title "Officer."

20. At all times relevant to this action, Y. Cheng was a Custody Assistant, J. Zavala was a Los Angeles County Sheriff's Deputy, and O. Estrada was a Los Angeles County Sheriff's Deputy.

21. Sanchez's hard work and determination paid off. He was accepted to the Sheriff's Academy, and was set to attend beginning on December 5, 2019.

22. On Friday, November 29, 2019, Sanchez was assigned to Module 171 as the Small Management Yard Recreation Custody Assistant for both the AM and PM shifts (5 a.m.—9 p.m.). At about 12:25 p.m., the AM shift crew usually prepares to leave for the day, and it was at that time that Deputy J. Zavala announced that before people leave to go to patrol or the Academy, there is a tradition of sending them off on a good note. Deputy Zavala was speaking ironically. Instead of sending Sanchez off on a good note, he intended to harm Sanchez in a hazing ritual. Deputy Zavala, like the other individual defendants in this case, knew that Sanchez was scheduled to begin at the Academy on December 5, 2019.

23. Deputy Zavala was standing in front of Sanchez when he announced his intent to haze Sanchez. Sanchez was sitting in a wheeled office chair. Officer Y. Cheng, a custody assistant, and Deputy O. Estrada, a sworn peace officer, were also present. Cheng and Estrada knew of the plan to haze Sanchez, approved of it, and were active participants in it.

24. Deputy J. Zavala then drew his taser and placed it on Sanchez's left leg as he was sitting in the chair with his feet flat on the ground. Sanchez immediately pushed away with his feet to roll back to avoid being stunned. Sanchez successfully avoided Zavala's taser, but he did not see Officer Y. Cheng lurking to his right. As Sanchez continued his efforts to push farther away from Zavala, he placed his legs under the chair to do so. Officer Y. Cheng tased Sanchez on the right leg at that time. Sanchez felt a terrible pain in his right thigh and saw that Officer Cheng had tased him. Deputy Estrada held Sanchez down in the chair the by shoulders.

25. The stun to Sanchez's right thigh was completely unexpected and he immediately felt a terrible, rushing pain in his right knee. The pain was so severe that he had to bite his finger.

Sanchez knew that he would not be able to stand, and so he remained seated, rubbing his knee, hoping that it would feel better.

26. As Sanchez sat in his chair attending to his wound, Zavala, Cheng, and Estrada were laughing and having a good time, proud of themselves for having successfully hazed Sanchez. They repeatedly told Sanchez that the pain would go away. Sanchez disagreed, stating that there was "something really wrong." The group told him to "walk it off."

27. Sanchez then stood up and tried to walk. He continued to feel pain his right knee, which caused him to limp any time he put his weight on his right knee. He then sat down and tried to bend his knee. This caused excruciating pain.

28. Sanchez tried to continue his shift, but was in too much pain to stay on his feet. He ended up spending the rest of his shift in the Module 171 booth in an effort to relax his leg. While he did so, he noticed that his leg was swollen. He naturally began to doubt whether his leg would be healthy in time for his imminent entrance into the Academy. Sanchez told Deputy A. Ayers and Officer M. Attencio, who were in the booth with Sanchez at the time, that his leg was swollen. Officer M. Attencio got Sanchez some ice in a plastic bag, which Sanchez used to sooth his knee.

29. At the end of Sanchez's shift, knowing that he did wrong and trying to conceal it, Deputy Estrada told Sanchez to conceal his injury by walking "normal." Sanchez tried his best to do so, but could not. He hobbled to the locker room. It took him nearly 25 minutes to walk to his car from the locker room. Deputy Nam, who had no part in Sanchez's injuries, helped him get to the employee parking lot elevator so that he could get to his car. Once he was in his car, Sanchez had to force his right leg to a bent position and use his left leg to drive.

30. Sanchez drove home, and was driven to the emergency room at San Dimas Community Hospital shortly thereafter. He was x-rayed and discharged after approximately 3 hours. The healthcare providers there explained that he needed an MRI, that they did not have one, and that he needed to seek care from a provider with access to an MRI. Sanchez could not sleep that night.

31. The next day, Sanchez called Lt. Bracken at Twin Towers and discussed his hazing. Lt. Bracken transferred Sanchez to the Watch Sergeant, Senior Deputy Javier Martinez. Martinez

refused to accept that Sanchez was injured, saying that "a taser won't hurt your leg." Martinez scolded Sanchez for reporting his injury, saying that "it's weak that you're calling and telling on your partners." Martinez continued the abuse, saying "I'm dealing with responsible people, not like you, so call me back in an hour and I'll deal with you in an hour." Sanchez hung up, waited for the shift to change, and called back, this time reaching Senior Deputy Calier. Sanchez explained the hazing to Senior Deputy Calier, who sent a car to Sanchez's house, which picked Sanchez up and took him to ProActive Work Health Services, where injured deputies are treated. Sanchez received some medication but no MRI.

32. On or about <u>December 10, 2019</u>, Lt. Bracken tried to get Sanchez to sign a document that would have stated that he was completely responsible for his own injury. Sanchez refused. Lt. Bracken then tried to dissuade Sanchez from including any damaging information in his written report about the hazing. When Sanchez presented her with his written report, Lt. Bracken edited it, saying that "you [Sanchez] don't want to give them all that information, because they're going to make things hard for you, and come after you really hard." At that point, the County aimed to make Sanchez the subject of its investigation into Sanchez's own injury, which would have disqualified him from entrance into the Academy.

33. On <u>August 25, 2020</u>, Sanchez sat for a recorded interview with Lt. Garcia and another Lt. whose identity is presently unknown to him. The Lieutenants repeatedly asked Sanchez if he asked to be hazed, and whether he consented to being hazed. Their agenda was not subtle and it was obvious. They wanted Sanchez to falsely admit that he was to blame for his own injury.

34. On <u>February 10, 2020</u>, Sanchez got an MRI (his second for this injury) at Cedars-Sinai. The orthopedist there explained to him that he has severe injuries to his right knee, and that he is disabled.

35. To this day, Sanchez has trouble carrying even groceries and must put his weight on his left leg. He has had arthroscopic surgery and various steroid injections, but his recovery has been limited. His physical therapists have explained to him that is going to have trouble with his right knee for a long time. Sanchez reasonably expects to be medically unfit for service as a police officer for the rest of his life as the result of the wrongful acts of the defendants.

36. Sanchez had a physical examination on October 15, 2019 in preparation for his entrance to the Academy. He was not injured at that time.

### FIRST CAUSE OF ACTION
### UNLAWFUL SEIZURE
### 42 U.S.C. § 1983 / U.S. Const. Amend. IV
### (Against Defendants Cheng, Zavala, and Estrada)

37. Plaintiff realleges, and incorporates herein by their reference, each and every allegation contained in the foregoing paragraphs, inclusive, as though fully set forth herein.

38. Defendants acted under color of California law. At all times set forth herein, they wore official uniforms, and wielded department-issued tasers. At all times set forth herein, they purported to act in their capacity as Deputy Sheriffs or Custody Assistants.

39. As set forth herein, defendants used force against Sanchez in their capacities as officers of the County of Los Angeles. Such use of force constitutes a seizure under the Fourth Amendment as a matter of law.

40. At the time defendants used such force, there was no legitimate reason to do so. Sanchez was sitting in an office chair, doing his job as a Custody Assistant when defendants wrongfully inflicted force upon him, causing injury. Under the circumstances, no force was necessary or appropriate. Sanchez was not a threat to anyone, or himself. The purpose of the defendants' use of force was to haze Sanchez, not to achieve any legitimate police purpose, or realize any legitimate police aim.

41. Defendants were on notice that such use of force violated Sanchez's well-established rights under the Fourth Amendment.

42. Sanchez was harmed.

43. These defendants' conduct was a substantial factor in causing Sanchez's harm.

44. In doing the things herein alleged, the acts and conduct of any individual defendants constituted "malice," "oppression" and/or "fraud" (as those terms are defined by Civ. Code § 3294(c)), in that these acts were intended by the individual defendants to cause injury to Plaintiff

8

UNLIMITED COMPLAINT FOR DAMAGES

and/or constituted despicable conduct carried on by the individual defendants with willful and conscious disregard of the rights of Plaintiff, with the intention of the individual defendants to deprive Plaintiff of property and legal rights, and were authorized or approved by the individual defendants, justifying an award of exemplary and punitive damages in an amount according to proof, in order to deter the individual defendants from similar conduct in the future, should be made.

## SECOND CAUSE OF ACTION

### EXCESSIVE FORCE

### 42 U.S.C. § 1983 / U.S. Const. Amend. XIV

### (Against Defendants Cheng, Zavala, and Estrada)

45. Plaintiff realleges, and incorporates herein by their reference, each and every allegation contained in the foregoing paragraphs, inclusive, as though fully set forth herein.

46. Defendants acted under color of California law. At all times set forth herein, they wore official uniforms, and wielded department-issued tasers. At all times set forth herein, they purported to act in their capacity as Deputy Sheriffs or Custody Assistants.

47. As set forth herein, defendants used force against Sanchez in their capacities as officers of the County of Los Angeles.

48. At the time defendants used such force, there was no legitimate reason to do so. Sanchez was sitting in an office chair, doing his job as a Custody Assistant when defendants wrongfully inflicted force upon him, causing injury. Under the circumstances, no force was necessary or appropriate. Sanchez was not a threat to anyone, or himself. The purpose of the defendants' use of force was to haze Sanchez, not to achieve any legitimate police purpose, or realize any legitimate police aim. Defendants intended to harm Sanchez by using force, and even tricked him into thinking that Deputy Zavala would tase him, when in fact Officer Cheng did. Deputy Estrada held Sanchez in the office chair during the tasing hazing in order to guarantee that he was harmed.

49. Defendants were on notice that such use of force violated Sanchez's well-established substantive due process rights under the Fourteenth Amendment.

9

**UNLIMITED COMPLAINT FOR DAMAGES**

50. Sanchez was harmed.

51. These defendants' conduct was a substantial factor in causing Sanchez's harm.

52. In doing the things herein alleged, the acts and conduct of any individual defendants constituted "malice," "oppression" and/or "fraud" (as those terms are defined by Civ. Code § 3294(c)), in that these acts were intended by the individual defendants to cause injury to Plaintiff and/or constituted despicable conduct carried on by the individual defendants with willful and conscious disregard of the rights of Plaintiff, with the intention of the individual defendants to deprive Plaintiff of property and legal rights, and were authorized or approved by the individual defendants, justifying an award of exemplary and punitive damages in an amount according to proof, in order to deter the individual defendants from similar conduct in the future, should be made.

## THIRD CAUSE OF ACTION

### PUBLIC ENTITY LIABILITY

### 42 U.S.C. § 1983 / U.S. Const. Amend. IV

### (Against Defendant County of Los Angeles)

53. Plaintiff realleges, and incorporates herein by their reference, each and every allegation contained in the foregoing paragraphs, inclusive, as though fully set forth herein. Further, all allegations set forth in this cause of action are pled upon information and belief, unless otherwise stated.

54. The County of Los Angeles has known about the hazing perpetrated by Sheriff's deputies for decades, if not longer. Yet the County refuses to take any action to stop the practice. On the contrary, the County and County employees know about and tolerate hazing, but seek to cover it up when it happens. In that respect, hazing such as what was inflicted upon Sanchez is the County of Los Angeles's official policy for purposes of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

55. Additionally, because the County has known about and tolerated hazing by Sheriff's Department employees for decades, it has failed to train its employees for purposes of *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).

56. In *Brown v. County of Los Angeles*, Los Angeles Superior Court case no. BC199959(II) (May 3, 2001), a class action case, a jury determined that Sheriff's Department employees harassed former MTA police who were merged with the Sheriff's Department in 1997. This hazing was widespread enough to merit a class action. On information and belief, the hazing included unwarranted uses of force. The County knew about the hazing. To date, the County has not stopped the practice of hazing among deputies.

57. More recently, Deputy P. Tucker was hazed by Sheriff's Department employees at Twin Towers jail, on information and belief during his final days before moving to a patrol position, in approximately 2019. The hazing involved unjustified uses of force. The County has not stopped the practice of hazing within the Sheriff's Department despite its knowledge of the same.

58. Plaintiff was harmed.

59. The County's official policy of hazing, and its failure to train its employees with respect to not hazing, were substantial factors in causing Plaintiff's harm.

## FOURTH CAUSE OF ACTION

**PUBLIC ENTITY LIABILITY**

**42 U.S.C. § 1983 / U.S. Const. Amend. XIV**

**(Against Defendant County of Los Angeles)**

60. Plaintiff realleges, and incorporates herein by their reference, each and every allegation contained in the foregoing paragraphs, inclusive, as though fully set forth herein. Further, all allegations set forth in this cause of action are pled upon information and belief, unless otherwise stated.

61. The County of Los Angeles has known about the hazing perpetrated by Sheriff's deputies for decades, if not longer. Yet the County refuses to take any action to stop the practice. On the contrary, the County and County employees know about and tolerate hazing, but seek to cover it up when it happens. In that respect, hazing such as what was inflicted upon Sanchez is the County of Los Angeles's official policy for purposes of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

62. Additionally, because the County has known about and tolerated hazing by Sheriff's Department employees for decades, it has failed to train its employees for purposes of *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).

63. In *Brown v. County of Los Angeles*, Los Angeles Superior Court case no. BC199959(II) (May 3, 2001), a class action case, a jury determined that Sheriff's Department employees harassed former MTA police who were merged with the Sheriff's Department in 1997. This hazing was widespread enough to merit a class action. On information and belief, the hazing included unwarranted uses of force, and the perpetrators intended to harm the victims. The County knew about the hazing. To date, the County has not stopped the practice of hazing among deputies.

64. More recently, Deputy P. Tucker was hazed by Sheriff's Department employees at Twin Towers jail, on information and belief during his final days before moving to a patrol position, in approximately 2019. The hazing involved unjustified uses of force. The perpetrators intended to harm Deputy P. Tucker. The County has not stopped the practice of hazing within the Sheriff's Department despite its knowledge of the same.

65. Plaintiff was harmed.

66. The County's official policy of hazing, and its failure to train its employees with respect to not hazing, were substantial factors in causing Plaintiff's harm.

### FIFTH CAUSE OF ACTION
### PUBLIC ENTITY LIABILITY
### 42 U.S.C. § 1983 (1ST AMENDMENT RETALIATION)
### (Against Defendant County of Los Angeles)

67. Plaintiff realleges, and incorporates herein by their reference, each and every allegation contained in the foregoing paragraphs, inclusive, as though fully set forth herein. Further, all allegations set forth in this cause of action are pled upon information and belief, unless otherwise stated.

68. Plaintiff reported his workplace injury, caused by the hazing inflicted upon him by Cheng, Zavala, and Estrada. This is not part of his official job duties. Hazing among jail staff,

1 including but not limited to sworn peace officers, causing injury to law enforcement personnel, is a matter of public concern.

69. The County of Los Angeles ran its playbook on Sanchez after he reported wrongdoing by Sheriff's Department personnel: punishing *him*, rather than the actual wrongdoer, and trying to cover up the wrongdoing that he reported.

70. When Sanchez reported the wrongdoing to the Watch Sergeant, he was met with abuse, scolding, and a refusal to accept that Sanchez was actually injured. Shortly thereafter, Sanchez was asked by a superior officer, Lt. Bracken, to sign a form that falsely implicated him *in his own injury and in his own hazing*. Lt. Bracken further discouraged Sanchez from including any damaging information in his written report about the hazing, and edited his report, threatening that if he included damaging information in it, "they're going to make things hard for you, and come after you really hard." Later, when Sanchez sat for a recorded interview, the interviewers had a transparent agenda of trying to blame Sanchez for his own injury, and *tried to bully him during the interview into admitting that he was responsible for his own injury, and that he consented to the hazing*.

71. Such actions were materially adverse to Sanchez.

72. Sanchez's report of being injured by other jail staff in a hazing ritual caused such materially adverse actions.

73. Such actions would dissuade a reasonable worker from reporting being injured by hazing.

74. Punishing people for reporting misconduct is behavior by the County of Los Angeles so routine as to constitute a playbook for that situation. It is the longstanding practice of the County of Los Angeles and the Sheriff's Department in particular. Such retaliation constitutes an official policy of the County of Los Angeles as provided by *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Additionally, the County is aware of this retaliatory practice and has failed to train its employees not to engage in it. Consequently, the County is liable for the unlawful retaliation against Sanchez for reporting his hazing injuries as provided by *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). Additionally, on information and belief, the official policymaker for the County of Los

1  Angeles has ratified the retaliation against Sanchez for reporting his workplace injury, and the
2  County is liable as provided by *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988).
3  //

14

**UNLIMITED COMPLAINT FOR DAMAGES**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as against Defendants, jointly and severally, as follows, for:

1) Compensatory damages in an amount according to proof at time of trial.

2) Attorney's fees and costs pursuant to all applicable statutes or legal principles, including, but not limited to: 42 U.S.C. § 1988

3) Punitive, or exemplary damages pursuant to Civ. Code § 3294 as against the individual defendants only.

4) Costs of suit incurred.

5) Prejudgment interest on all amounts claimed as permitted by law.

6) Post judgment interest on all applicable amounts as permitted by law.

7) All other general, specific, direct, indirect, consequential, and incidental damages, in an amount according to proof at time of trial.

8) Such other and further relief as the Court may deem proper.

ROMERO LAW, APC

DATED: November 15, 2021          By: _____
Alan Romero (SBN 249000)
Ted Wells (SBN 321696)
Angela Xie (SBN 333530)
Lucas E. Rowe (SBN 298697)
Attorneys for Plaintiff
JOSHUA SANCHEZ

## DEMAND FOR JURY TRIAL

Plaintiff hereby makes demand for Jury Trial, and has timely posted the jury fee deposit.

ROMERO LAW, APC

DATED: November 15, 2021            By: _____
Alan Romero (SBN 249000)
Ted Wells (SBN 321696)
Angela Xie (SBN 333530)
Lucas E. Rowe (SBN 298697)
**Attorneys for Plaintiff**
**JOSHUA SANCHEZ**

UNLIMITED COMPLAINT FOR DAMAGES